IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

LAVETA GILLHAM                                              PLAINTIFF

          v.              Civil No. 06-6047

MICHAEL J. ASTRUE, COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION
OF THE UNITED STATES OF AMERICA                            DEFENDANT

J U D G M E N T

Plaintiff Laveta Gillham brings this action pursuant to **42 U.S.C. §405(g)**, seeking judicial review of a decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the provisions of Title II and Title XVI of the Social Security Act.  The Court, having fully reviewed the record in this matter, and given careful consideration to the briefs of the parties, the **Report And Recommendation Of The United States Magistrate Judge** (document #8), and plaintiff's **Written Objections To The Report And Recommendation Of The United States Magistrate Judge** (document #9), finds and orders as follows:

1.   At the time of her hearing before the Administrative Law Judge ("ALJ") on November 9, 2005, Gillham was 51 years old. She held a General Education Development diploma ("GED") and a diploma in Business Education from Quapaw Vo-Tech School.  Prior to her alleged onset of disability, on October 1, 2003, she had last

worked as an electrician's assistant.  At the time of the hearing, she was working 40 hours a week as a teller at the Hot Springs Federal Credit Union, but she expected to drop back to working just a few days a week after the first of the year.[1]  She was Hepatitis-C positive.

The ALJ found that Gillham suffered from the medically-determinable impairments of degenerative disc disease of the lumbar and cervical spine, and depression.  He concluded that she was incapable of performing her past relevant work as an electrician's assistant, and that she had no skills transferrable to her residual functional capacity, which he found to be light work.  Light work was further limited to jobs "which can be performed with short, simple instructions and moderate limitations in her ability to interact appropriately with the public, supervisors or co-workers, and in her ability to respond appropriately to changes in work pressures or changes in a routine work setting."  Light work was also limited by Gillham's diagnosis of Hepatitis-C, which rendered her unable to perform jobs working around food.

Based on the testimony of a Vocational Expert, the ALJ found that Gillham could work as a hand assembler or housekeeper/maid, and that such jobs existed in significant numbers in the economy.

---

[1]The ALJ found that Gillham's earnings in 2005 did not "rise to the level associated with substantial gainful work activity," and that she had not "engaged in substantial gainful activity" since the alleged onset of disability.

Thus, he concluded that Gillham was not disabled as defined by the Social Security Act.

2.   Gillham requested that the Appeals Council review the ALJ's decision, but the Appeals Council declined to do so, thus making the ALJ's decision the final decision of the Commissioner in this case.  Gillham then filed suit seeking judicial review.

The matter was referred to United States Magistrate Judge Barry Bryant for Report And Recommendation.  That Report And Recommendation has been received, as well as Gillham's Objections thereto, and the matter is ripe for consideration by the Court.

3.   Upon review, this Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, considering both the evidence which supports that decision and the evidence which detracts from it. **Siemers v. Shalala, 47 F.3d 299 (8th Cir. 1995).**  Substantial evidence is not necessarily a preponderance of the evidence, but it must be enough that a reasonable mind might find it adequate to support the conclusion drawn from it.  If it is possible to draw two inconsistent conclusions from the evidence, and one of them is the Commissioner's conclusion, this Court must affirm the Commissioner's decision. **Oberst v. Shalala, 2 F.3d 249 (8th Cir. 1993).**

4.   Gillham challenges the Commissioner's decision, and the Report And Recommendation, on the following grounds:

* They do not consider her impairments in combination.

* They fail to consider the effect of pain on her residual functional capacity.

* They fail to consider the effect of non-exertional limitations on her residual functional capacity.

* The matter should be remanded with instructions to obtain a residual functional capacity determination from Gillham's treating neurologist.

5. A review of the Administrative Record reflects the following entries relevant to Gillham's claims:

* On December 6, 1999, Gillham saw Eric Carson, D.C., for complaints of neck, left arm, mid- and low-back pain, and headaches, which she related partly to a car accident a year earlier and partly to a fall a few weeks earlier. At that time her cervical and lumbar disc heights were within normal limits, but she had "straightening of the normal cervical lordosis"[2] and spinal subluxations[3] at C2, C5, T5, and L1-L5. Dr. Carson stated that in his opinion, "tearing of the posterior cervical ligaments and musculature" had caused the spine to "lose its normal lordosis," which "alters

---

[2]The "normal, anteriorly convex curvature of the cervical segment of the vertebral column." This and all other medical definitions herein, unless otherwise noted, are taken from Stedman's Medical Dictionary, 28th Edition.

[3]"Luxation" is a synonym for dislocation; a subluxation is an incomplete luxation or dislocation.

the spinal biomechanics and stretches the spinal cord," and "[o]ver time it will also lead to degenerative disc disease if not corrected."

*   On October 18, 2001, Gillham saw Jacob Abraham, M.D., who is Board Certified in Pain Medicine and Anesthesiology, with "multiple pain complaints, especially involving the neck and lower back. She described "pain which starts in the neck which radiates into bilateral upper extremities. The pain radiates into the hands bilaterally and is associated with tingling and numbness. She additionally complains of lower back pain with radiation into the right lower extremity and into the bottom of the foot." Gillham related this pain to a car accident on August 17, 2001. MRI studies dated October 5, 2001, showed "central posterior disk protrusion at C4-5 and C6-7, and to a lesser extent C5-6," and mild cervical spondylosis.[4] Decreased neck range of motion was observed; there was localized tenderness over affected areas of the spine; and straight leg raising[5] was positive bilaterally, greater on the right than the left. There was

_____

[4] A synonym for "ankylosis," meaning "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion." It is "often applied nonspecifically to any lesion of the spine of a degenerative nature."

[5] "[P]assive dorsiflexion of the foot in the supine patient with the knee and hip extended; back pain with this indicates nerve root compression or impingement."

-5-

diminished sensation to pinprick and light touch in the right lower extremity in "approximately an L5 distribution." There was also decreased sensation in both hands. Dr. Abraham diagnosed cervical disk protrusions at C4-5, C6-7, and C5-6; cervical radiculitis[6]; cervical spondylosis/facet syndrome; and lumbar radiculitis of the right lower extremity. He planned to use cervical epidural steroid injections and bilateral cervical facet injections to alleviate pain, and obtain an MRI to further evaluate the lower back and lower extremity pain.

*   On December 7, 2001, Dr. Abraham carried out a cervical epidural steroid injection under fluoroscopy and conscious sedation.

*   On March 6, 2002, Gillham saw Dr. Abraham, who prescribed Flexeril and Norco.[7]

*   On September 16, 2002, Gillham saw Dr. Abraham, who continued her Norco and Flexeril.

*   On September 26, 2002, Gillham saw Daniel Cartaya, M.D., with complaints of depression, difficulty falling

---

[6]"Disorder of the spinal nerve roots."

[7]According to the Physician's Desk Reference, 2007 Edition (the source of all drug information in this Order unless otherwise specified), Norco is a pain reliever composed of hydrocodone and acetaminophen. Hydrocodone is an opioid which can cause, among other things, drowsiness, mental clouding, lethargy, impairment of mental and physical performance, and mood changes. Flexeril, according to the Physician's Desk Reference, 1995 Edition, is used for "relief of muscle spasm associated with acute, painful mulculoskeletal conditions." It, too, can cause drowsiness.

asleep, and decreased appetite.  Dr. Cartaya noted that
Gillham had seen Dr. Abraham, "who wanted to perform
radiofrequency ablation in her neck, however, she cannot
afford it since she does not have insurance."  Dr.
Cartaya prescribed Lexapro[8].

* On October 18, 2002, Gillham saw Dr. Cartaya with
symptoms "improved only somewhat."  She was sleeping too
much and eating too much.   Dr. Cartaya stopped the
Lexapro and started Gillham on Remeron.

* On January 2, 2003, Gillham saw Dr. Cartaya, having
"failed Effexor[9]," but with improvement in her
depression, and a complaint of weight gain.

* On January 13, 2003, Gillham saw Dr. Abraham, who
prescribed Norco, up to four doses daily, and Flexeril.

* On January 28, 2003, Gillham saw Dr. Cartaya for follow-
up on weight loss.  She reported improvement "from a
mood standpoint since she started working at Petco."

* On March 4, 2003, Gillham saw Dr. Cartaya who noted that
her blood pressure was "adequate" on Phentermine, a
weight-loss drug, and that he would continue it, but
that she "continues not to exercise."  He noted that he
"strongly urge[d] her to start dieting and exercising,"

---

[8]An antidepressive.

[9]Another antidepressive.

and that if she was not losing weight at her one-month follow-up, he would discontinue the Pentermine.

* On April 3, 2003, Gillham saw Dr. Cartaya with complaints of "heartburn and generalized pain," as well as difficulty sleeping, depression, and decreased appetite. Dr. Cartaya continued her Nexium[10] for two or three weeks, and referred her to counseling.

* On May 22, 2003, Gillham saw Dr. Abraham, who noted that she had a diagnosis of cervical spondylosis and cervicogenic[11] headaches, but that her pain was well controlled on Norco, taken four times daily.

* On May 22, 2003, Dr. Abraham renewed Gillham's Norco prescription amd sent a letter to Dr. Cartaya "to take over pain meds." He planned further procedures when Gillham had insurance.

* On May 29, 2003, Gillham began working at 10 Mile Grocery and Deli. She worked there through March, 2004.

* A chest x-ray of August 26, 2003, revealed "some osteophytes[12] throughout the spine."

* On September 19, 2003, Gillham saw Dr. Cartaya with complaints of "waking up with generalized joint pains"

---

[10]Used to treat heartburn.

[11]Produced by the neck.

[12]Bony outgrowths.

-8-

and "generalized fatigue."  He prescribed Vioxx, to be followed by Ibuprofen, and referred her to DHS "since she has been told by Dr. Abraham to apply for Disability."

* On October 24, 2003, Gillham saw Dr. Cartaya, wanting to increase her Norco to four times a day.  Dr. Cartaya prescribed Norco and Flexeril.  He noted that Gillham had seen Dr. Abraham six months earlier for a second opinion, and that she now had no insurance, so he would "wait until she gets health insurance before I refer her back to Dr. Abraham."

* On December 16, 2003, Gillham saw Dr. Cartaya, complaining that her neck pain "is worse during the wintertime."  He refilled her Norco, and started her on Elavil[13] at bedtime.

* On January 29, 2004, Gillham completed a Work Activity Report - Employee, in which she stated that she had been doing electrical work and "had to quit due to the pain I am experiencing.  It hurts to move fast, lift things."

* On March 2, 2004, Gillham saw Dr. Cartaya with a two-week history of "worsening pain of her neck," but with "full range of motion of her neck as well as her arms."

---

[13]According to the 1995 Physician's Desk Reference, Elavil is an antidepressant with sedative effects.

Dr. Cartaya prescribed an injection of Demerol[14] and Phenergan, increased Gillham's prescription for Elavil, and renewed her prescription for Norco.  He recommended follow-up with a chiropractor.  He also noted that he had suggested steroids, but Gillham had refused, and that he "will likely not refill her narcotics early unless she agrees to take a Medrol Dospak."

*   On April 1, 2004, Brad Williams, Ph.D., conducted a Functional Capacity Assessment of Gillham, offering the opinion that she "is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete."

*   Also on April 1, 2004, Steve Owens, M.D., conducted a Functional Capacity Assessment of Gillham.  He did so without benefit of a treating or examining source statement regarding Gillham's physical capacities.  Dr. Owens assessed cervical degenerative disc disease and osteoarthritis without significant exam findings.

*   On May 28, 2004, Gillham had x-rays of her cervical spine, which showed degenerative joint disease,

_____

[14]According to the 1995 Physician's Desk Reference, Demerol is used to teat moderate to severe pain.

-10-

specifically hypertrophic[15] spurring at C5, 6 and 7;
reduction of the intervertebral disc spaces at C5-C6 and
"C6-C6" [sic]; and narrowing of the neural foraminal
spaces at C5-C6 and C6-C7.

* In June, 2004, Brenda Nobles, Ph.D., submitted a Mental
Status and Evaluation of Adaptive Function report about
Gillham for consideration.  She noted that Gillham
reported working part time at a convenience store "just
to get my medicine," and that due to a car accident "the
discs in my neck are not as they should be."  She
reported problems driving and performing household
chores due to neck pain, and problems dressing due to
carpal tunnel syndrome in her left hand. Gillham
reported taking Norco, Flexeril, and steroids.  She
described depression that made her want to sleep more,
affected her energy level, and made her irritable with
others.  Dr. Nobles diagnosed Gillham with Depressive
Disorder, Not Otherwise Specified," with a guarded
prognosis given effective treatment.

* On August 19, 2004, Gillham completed a Reconsideration
Disability Report, stating that "[m]y pain is extreme in
my spine & neck making it difficult to move," but also
indicating that she was working three days a week.

---

[15]This term refers to a "[g]eneral increase in bulk of a part or organ, not due to
tumor formation."

\*   On September 14, 2004, Gillham completed a Function
     Report - Adult, in which she indicated difficulties in
     personal care because her neck, hands and arms hurt, and
     her hands would "go numb."  She described the pain as
     "it feels like a knife in my neck."

\*   On September 21, 2004, Gillham completed a Social
     Security Disability Report, in which she indicated that
     she had "[c]onstant pain, sometimes like a knife in my
     neck, other times not so severe."  She reported pain in
     her head, neck, arms and hands, and that she was
     sometimes sick at her stomach.

\*   On February 3, 2005, Gillham completed a Disability
     Report - Appeal, in which she stated that "what ever I
     try to do, I have to stop and rest before I can finish
     anything.  The pain takes all my energy.  Feels like a
     vice grip on my neck."

\*   On November 9, 2005, Gillham testified at a hearing
     before the ALJ.

\*   On December 30, 2005, Sam Boyd, Ph.D. conducted a
     Psychological Evaluation With Mental Status Examination
     of Gillham.  Gillham related "Carpel Tunnel Syndrome and
     back pain and weakness" as a result of a motor vehicle
     accident in August, 1999.  She was taking Navco[16],

---

[16]This appears to be a typographical error, the drug Norco being intended.

Flexeril, and Wellbutrin[17].  She was then working "one or two days a week as a teller at a credit union," and had held the job for four months.  She reported that she could not work full time "because of her pain," and that she spent her days "doing household chores, listening to music, and visiting her mother."  Dr. Boyd did not assess any diagnosis on Axis I, II, or IV; on Axis III he noted "[n]umerous physical problems (by history)"; and on Axis V he assessed a GAF of 55[18].  He found no problems with concentration, persistence or pace, and no cognitive deficits.  Dr. Boyd also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), in which he found that Gillham's ability to "respond appropriately to supervision, co-workers, and work pressures in a work setting" was moderately impaired by "mild depression."

\*    On January 17, 2006, a neurological evaluation of Gillham was conducted by Patricia Knott, M.D., who is Board Certified in Physical Medicine and Rehabilitation. Dr. Knott noted that Gillham related "discomfort in her lumbar and cervical areas" to two car accidents in 2001

---

[17]An antidepressant.

[18]According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, a GAF, or Global Assessment of Functioning, between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

and "a few years before that," and that she "has not
been able to afford any surgery, therapy or x-rays."
Gillham reported constant, sharp, shooting pain to her
neck, and lumbar pain that "comes and goes," treated
with Norco, Flexeril, and Wellbutrin.  She was at that
time working as a teller on Fridays and the days after
holidays.   Dr.  Knott  observed  that  Gillham  had
discomfort[19] in her lower back and posterior thigh on
straight leg raising to 90 degrees; discomfort on
palpation of the spinous process at C5-6, C6-7, and the
right  paraspinous  musculature  and  right  trapezius[20]
area;  discomfort  to  the  left  paraspinous  cervical
musculature from C3-C7; discomfort to the left trapezius
area;  discomfort  on  palpation  of  the  paraspinous
musculature from L4 down on the right and on the left
but not to the lumbar spinous process; discomfort to the
right  cervical  paraspinous  musculature  and  down  the
middle of her neck on full forward cervical flexion;
pain down the center of her neck on full extension; a
"catch  to  the  left  cervical  paraspinous  musculature,

---

[19]While Stedman's does not define "discomfort," it defines "pain" as "a variably
unpleasant sensation associated with actual or potential tissue damage and mediated by
specific nerve fibers to the brain where its conscious appreciation may be modified by
various factors."  Given this definition, the Court finds it appropriate to understand,
by Dr. Knott's usage of the word "discomfort," that what is commonly understood as
"pain" is meant.

[20]One of the shoulder muscles.

-14-

which goes down her arm," upon 75% left rotation; 90% right rotation without discomfort; "75% right lateral bending with discomfort to the right cervical paraspinous musculature," and "50% left lateral bending with discomfort to the left trapezius and cervical paraspinous musculature."  In the lumbar spine, Dr. Knott noted discomfort "to the left lumbar spinous musculature up to her neck on forward flexion"; and "discomfort across her lower back and up to her neck" on extension; "left lumbar paraspinous discomfort on left rotation" and "pulling on the left with right rotation"; "discomfort to the left lumbar paraspinous musculature radiating upwards on left lateral bending" and "pulling on the left with right lateral bending."  Dr. Knott's impression was cervical degenerative disc disease, "possible" lumbar degenerative disc disease, and bilateral carpal tunnel syndrome.  Dr. Knott found that Gillham could perform the following activities for one-third of an eight-hour workday:  lift/carry up to twenty pounds; reach, grasp, manipulate, handle or feel objects; operate hand or foot controls; climb; balance; stoop; crouch; kneel; or crawl.  Dr. Knott found Gillham had the capacity to sit, and to stand or walk, for up to six hours in an eight-hour workday.

6.   The  foregoing  recitation  of  Gillham's  condition
persuades the Court that there is merit in Gillham's contention
that  the  ALJ  failed  to  consider  all  her  impairments  in
combination,  and  to  consider  the  effect  of  her  non-exertional
limitations  on  her  residual  functional  capacity.   Dr.  Abraham's
records  reflect  that  by  October,  2001,  Gillham  was  experiencing
not  only  neck  and  back  pain,  but  pain  radiating  into  both  hands
which  was  associated  with  tingling  and  numbness.[21]   The MRIs and
x-rays provide objective evidence of damage to Gillham's cervical
spine  which  would  explain  the  symptoms  in  her  hands  and  arms.
That  damage  was  never  surgically  corrected,  treatment  being
limited to some physical therapy, and pain management with opioids
and muscle relaxants.

The  neurological  evaluation  of  the  consultant,  Dr.  Knott,
confirms  that  Gillham's  use  of  her  arms  and  hands  was  still
significantly  affected  in  January,  2006.   Dr.  Knott  examined
Gillham, and found that she could only reach, grasp, manipulate,
handle or feel objects, or operate hand or foot controls, for one-
third of an eight-hour day.

The  only  medical  opinion  in  the  Record  contradicting  the
opinions  of  Dr.  Abraham  and  Dr.  Knott  is  the  Functional  Capacity
Assessment  of  Dr.  Owens,  which  was  made  without  benefit  of  a

---

[21]Gillham and Dr. Knott referred to this condition as carpal tunnel syndrome.  The
medical evidence suggests that nerve entrapment within the carpal tunnel is probably not
the etiology of Gillham's hand numbness, but the result is similar as is the impact on
her ability to work.

treating or examining source statement.  Such evaluations by non-treating, non-examining physicians "ordinarily do not constitute substantial evidence on the record as a whole."  **Nevland v. Apfel**, **204 F.3d 853 (8th Cir. 2000).**  The ALJ should obtain opinions on residual functional capacity from either claimant's own doctors or consultants who examine claimant.  In this case, both Gillham's own doctor, Dr. Abraham, and the examining consultant, Dr. Knott, found significant problems with the usage of her hands and arms.

The ALJ did not consider how these limitations might affect Gillham's residual functional capacity, either separately or when taken together with her other impairments, nor did he include them in the hypotheticals he posed to the Vocational Expert.  Gillham's counsel did present the prospect of carpal tunnel syndrome to the Vocational Expert, who then testified that such a condition would eliminate from consideration the jobs that she thought Gillham could perform.  Thus the problems with Gillham's hands and arms clearly affects the types of jobs that Gillham can perform.

In addition, the Court finds that the ALJ did not give proper consideration to the effect of pain, and the pain medications, on Gillham's ability to work.  The ALJ gave "reduced weight" to Gillham's testimony about her pain and the limitations it imposed on her ability to work, primarily because of Dr. Abraham's report, in May, 2003, that Gillham's pain was "well controlled" on Norco. The medical records reflect that Gillham continued to complain of

-17-

pain after May, 2003, in spite of her medications, suggesting that perhaps "well controlled" was an optimistic evaluation.   In addition, while Gillham did not attribute any side effects to her medications, that is not dispositive.   She complained frequently of depression and fatigue, both of which are recognized side effects of Norco.   The Court, therefore, finds that further consideration should be given by the ALJ to the extent of Gillham's pain, and the effect it -- or its side effects -- might be having on her ability to work.

7.   For the foregoing reasons, the Court finds that Gillham's Objections to the Report And Recommendation have merit; that the Report And Recommendation should not be adopted, and that this matter should be reversed and remanded to the Commissioner for further consideration of the effect Gillham's arm and hand limitations, and her pain and the possible side effects of pain medication, have on her residual functional capacity.

8.   The Court further finds that Gillham is entitled to an award of reasonable attorney's fees, under the Equal Access to Justice Act, if she files a sufficient application therefor within thirty days after this Judgment becomes "not appealable," i.e., thirty days after the sixty-day time for appeal has ended.   *See* **Shalala v. Schaefer**, **509 U.S. 292 (1993)**.

**IT IS THEREFORE ORDERED** that the **Report And Recommendation Of The United States Magistrate Judge** (document #8) is **not adopted**.

**IT IS FURTHER ORDERED** that the decision of the Commissioner is **reversed,** and this matter is **remanded** to the Commissioner for further consideration, in light of this Judgment, pursuant to sentence four of **42 U.S.C. §405(g).**

**IT IS FURTHER ORDERED** that Gillham is entitled to an award of reasonable attorney's fees, if timely application therefor is filed.

**IT IS SO ORDERED,** this 26th day of September, 2007.

 /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**

-19-